UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BINA RADOSTI, on her own behalf and as next friend of DASH RADOSTI, JOSHUA ROTTMAN, SALLY RIFE, HEATHER ZERN, ZACHARY JOHNSON BURTON, and LATIANA CARTER individually and on behalf of all others similarly situated, | : : : : : : | |
| | : | Civil Action No. 09-0887 (CKK) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ENVISION EMI, LLC, | : | |
| | : | |
| Defendant. | : | |

---

**BRIEF *AMICUS CURIAE* OF THE ATTORNEYS GENERAL OF TENNESSEE, ALASKA, CONNECTICUT, DISTRICT OF COLUMBIA, FLORIDA, IDAHO, ILLINOIS, KANSAS, MARYLAND, MASSACHUSETTS, MICHIGAN, MISSISSIPPI, NEVADA, NEW JERSEY, NEW MEXICO, NORTH DAKOTA, OHIO, PENNSYLVANIA, SOUTH CAROLINA, SOUTH DAKOTA, VERMONT, AND WEST VIRGINIA OPPOSING FINAL APPROVAL OF PROPOSED SETTLEMENT AGREEMENT**

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES … iii

INTRODUCTION … 1

BACKGROUND … 2

ARGUMENT … 4

I.  THE PROPOSED SETTLEMENT IS SUBJECT TO AND DOES NOT
SURVIVE HEIGHTENED SCRUTINY … 4

   A. The Class Action Fairness Act requires heightened judicial scrutiny of
coupon settlements. … 4

   B. The proposed coupon settlement is of low value, with disproportionate
attorney and incentive fees. … 9

II.  THE PROPOSED COUPON SETTLEMENT IS UNFAIR, UNREASONABLE,
AND INADEQUATE UNDER TRADITIONAL FED.R.CIV.P.23(e)
ANALYSIS. … 12

   A. The likelihood of establishing liability and liquidating a substantial monetary
award for the class to judgment is strong,
but relief is disproportionately weak. … 13

   B. The proposed settlement was reached prior to class certification. … 15

   C. The reaction of the class and opposition of governmental participants counsel
against settlement approval. … 16

III. CLASS COUNSEL AND CLASS REPRESENTATIVES INADEQUATELY
REPRESENTED THE CLASS BY SECURING ATTORNEYS' FEES AND
INCENTIVE AWARDS DISPROPORTIONATE TO RECOVERY OF
UNNAMED CLASS MEMBERS. … 18

CONCLUSION … 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amchem Prods, Inc. v. Windsor,*
    521 U.S. 591 (1997)........................................................................................23, 24

*Clement v. Am. Honda Fin. Corp.,*
    176 F.R.D. 15 (D. Conn. 1997)........................................................................24, 25

*Cohen v. Chilcott,*
    522 F. Supp. 2d 105 (D.D.C. 2007) ........................................................................18

*Equal Rights Ctr. v. Washington Metro. Area Transit Auth.,*
    573 F. Supp. 2d 205 (D. D.C. 2008) .......................................................................18

* *Figueroa v. Sharper Image Corp.,*
    517 F.Supp.2d 1292 (S.D. Fla. 2007) ...............................................9, 10, 20, 21

*Fleury v. Richemont N. Am., Inc.*
    No. C-05-4525 EMC, 2008 WL 3287154 (N.D. Cal. Aug. 2, 2008) (Attached as Ex. A)......10

*Grant v. Bethlehem Steel Corp.,*
    823 F.2d 20 (2d Cir. 1987)......................................................................................11

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) ................................................................................21

*Hansberry v. Lee,*
    311 U.S. 32 (1940)..................................................................................................24

*Heaton v. Monogram Credit Card Bank of Georgia,*
    297 F.3d 416 (5th Cir. 2002) ..................................................................................22

*In re Cendant Corp. Litig.,*
    264 F.3d 201 (3d Cir. 2001).....................................................................................10

*In re Prudential Ins. Co. of Am. Sales Practices Litig.,*
    148 F.3d 283 (3d Cir. 1998).....................................................................................22

*In re Vitamins Antitrust Litig.,*
    305 F. Supp. 2d 100 (D.D.C. 2004) ........................................................................18

*In re Warfarin Sodium Antitrust Litig.,*
    391 F.3d 516 (3d Cir. 2004).....................................................................................21

*Kearns v. Ford Motor Co.,*
No. CV 05-5644, 2005 WL 3967998 (N.D. Cal. Nov. 21, 2005) (Attached as Ex. B) ..........10

*Milkman v. Am. Travelers Life Ins. Co.,*
No. 03775 (Penn. Ct. Common Pleas 2001)........................................................................22

*Petruzzi's, Inc. v. Darling-Delaware Co.*,
880 F.Supp. 292 (M.D. Pa. 1995).......................................................................................14

*Phillips Petroleum v. Shutts,*
472 U.S. 797 (1985)............................................................................................................19

*Reynolds v. Beneficial Nat'l Bank,*
288 F.3d 277 (7th Cir. 2002) ..............................................................................................10

*Rodriguez v. West Publishing Corp.*,
563 F.3d 948 (9th Cir. 2009) ..............................................................................................24

*Roller-Edelstein v. Wyndham Int'l, Inc.,*
Case No. 02-04946-A (Cir. Ct. - Dallas 2006) (Florida Attorney General objected to proposed
class action settlement concerning disclosure of prices at hotel chain)..................................22

\* *Synfuel Techs., Inc. v. DHL Express, Inc.,*
463 F.3d 646 (7th Cir. 2006) ("[A]lthough this case is not covered by the Class Action
Fairness Act (CAFA) of 2005, we note that in that statute Congress required heightened
judicial scrutiny of coupon-based settlements based on its concern that in many cases 'counsel
are awarded large fees, while leaving class members with coupons or other awards of little or
no value.'" [*quoting* Pub. L. 109-2, § 2(a)(3)(A)]) ...............................................................10

*Texas v Am. Tobacco Co*.,
14 F. Supp. 2d 956 (E. D. Tex. 1997).................................................................................22

*The Need to Study Coupon Settlements in Class Action Litigation*, 18 ..............................9, 17, 23

*Thomas v. Albright,*
139 F.3d 227 (D.C. Cir. 1998) .....................................................................................17, 18

\* *True v. Am. Honda Motor Co.,*
No. EDCV 07-0287-VAP ..............................................................................................14, 15, 16

**STATUTES**

28 U.S.C. § 1712.................................................................................................................12

28 U.S.C. § 1712(e) .....................................................................................................11, 13

D.C. Code § 28-3904(e), (f).........................................................................................19, 20

D.C. Code § 28-3905(k)(1).................................................................................................19

Pub. L. No. 109-2, 119 Stat. 4 .................................................................................11

sections of title 28 of the United States Code .........................................................11

**OTHER AUTHORITIES**

*CAFA Settlement Notice Provision: Optimal Regulatory Policy?* 156...........................22

Class Action Fairness Act of 2005..............................................................................11

*Class Action Objectors*, at 451..................................................................................23

*Class Action Objectors: Extortionist Free Riders or Fairness Guarantors,* 2003 ........22

Fed. R. Civ. P. 23(e)(2)................................................................................................24

Federal Rule of Civil Procedure 23(a)(4) ....................................................................23

Federal Rule of Civil Procedure 23(e) ...........................................................10, 17, 18

*Frequently Asked Questions,* NATIONAL YOUNG LEADERS PROGRAM .........................15

GEO. J. LEGAL ETHICS 1395, 1396 (2005) ....................................................................9

*Improving Class Action Efficiency by Expanded Use of Parens Patriae Suits and Intervention,* 74 TULANE L. REV. ...............................................................................................22

*reprinted in* 2005 U.S.C.C.A.N. 3 ..............................................................................11

Rule 23 .......................................................................................................................23

Rule 23(b)(3)(D)'s ......................................................................................................23

S. Rep. 109-14 (2005).........................................................................................12, 13

S. Rep. 109-14 (2005)..................................................................................................11

*Tuition and Financial Assistance,* NATIONAL YOUNG LEADERS CONFERENCE .............15

*Tuition,* NATIONAL YOUNG SCHOLARS PROGRAM .......................................................15

U. CHI. LEGAL F. 403, 453 ..........................................................................................22

U. PA. L. REV. 1971, 1988-1990 (2008).......................................................................22

## INTRODUCTION

The Attorneys General of the States of Tennessee, Alaska, Connecticut, Florida, Idaho, Illinois, Kansas, Maryland, Massachusetts, Michigan, Mississippi, Nevada, New Jersey, New Mexico, North Dakota, Ohio, Pennsylvania, South Carolina, South Dakota, Vermont, and West Virginia, and the District of Columbia ("the States"), in their capacity as *amici curiae*, make a special appearance[1] to urge the Court to reject the proposed settlement.  The States have no financial stake in this litigation and submit this brief both to protect their residents and to assist the court.

Despite strong claims that Defendant Envision EMI, LLC ("Envision") misrepresented the key selling-points of its inaugural conferences almost wholesale to middle school, high school, and college students seeking to bear witness to, participate in, and learn about the hallmark celebration of American democracy, the parties have negotiated a settlement where the sole relief offered to unnamed student class members are two coupons that force class members to pay significant additional sums to Envision and that contain numerous restrictions on eligibility, redemption, and aggregation that further limit their value. Similarly, the "*cy pres*" component of the settlement does not benefit a third party charitable organization, but instead allows Envision the unilateral discretion to operate the scholarship fund as a promotional tool to generate more business.

In marked contrast, class counsel and the named plaintiffs stand to receive up to $1,455,000 and $15,000 in cash respectively — an enormous amount given the paucity of relief afforded to unnamed class members under the proposed settlement — especially considering that class counsel's fee request is based on a lodestar multiplier.

---

[1] The States submit to the jurisdiction of this court in their capacity as *amici*.  The brief is filed without prejudice to the States' ability to bring any enforcement action against the Defendant.

As other federal courts have observed when the relief for unnamed class members is of negligible value, as it is here, the class's risk of receiving nothing as a result of the defendant's purported financial condition is worth taking. Moreover, regardless of Envision's financial condition, it should not benefit from a settlement that resolves strong allegations and legal claims of improper business practices. Here, despite the release of such claims, the chief benefits under the settlement including the coupons and the so-called *cy pres* fund are structured to generate more business for Envision and further require substantial additional expenses from consumers.

## BACKGROUND

This case arises out of three youth inaugural conferences held by Defendant Envision, under the name of the Congressional Youth Leadership Council ("CYLC"), during the Inauguration of President Barack Obama. *See* Doc. No. 13, at 9. During the 2005 inauguration, CYLC invited approximately 800 students to such conferences. *Id.* Despite advertising that the conferences were highly selective and despite having little to no experience managing an event of such magnitude, CYLC accepted over 15,000 students to attend the 2009 conferences. *Id.* at 12. The result was disastrous.

CYLC found itself unable to provide the product it promised in the face of such mass enrollment. CYLC promised attendees, who paid between $2,380 to $2,620, that the conferences would include, among other things: (1) presence at the inauguration and the inaugural parade; (2) attendance at an exclusive Black Tie Gala Inaugural Ball; (3) admission to keynote addresses by Lance Armstrong and other speakers; (4) interaction with historians, White House officials and congressional leaders; and (5) food, transportation, and deluxe accommodations at the Omni Shoreham and Marriot Wardman Park hotels *Id.* at 12-13. The

amended complaint alleges that these representations were false giving rise to claims for negligent misrepresentation, breach of contract, and violation of the District of Columbia Consumer Protection Procedures Act. *Id.* at 21-23.

The relief under the proposed settlement consists – exclusively – of two coupons. *See* Doc. No. 18-2, at 10-12. To even be eligible for the coupons, class members must verify that they missed one of the three narrowly-defined inaugural events, limited to the inauguration on the National Mall, the inaugural parade, and the Black Tie Gala Inaugural Ball. No relief has been provided to absent class members under the proposed settlement for other material misrepresentations set forth in the First Amended Complaint or for the failure to provide access to the events as represented.

Each coupon entitles the recipient to a $625 discount from the cost of a future Envision conference or program. *Id.* The coupons must be used individually – that is, class members must purchase two additional conferences from Envision to receive the full value of the settlement — unless the conference or program costs at least $3,500. *Id.* Further, Envision will not accept coupons from more than ten percent of attendees enrolled in any future conference. *Id.*

Although the proposed settlement also provides for the creation of a "*cy pres*" fund in the amount of the difference between the aggregate face value of coupons claimed and $8,000,000, Envision retains the unilateral discretion to select which customers receive funds and how much they receive, and to decide whether to deplete the fund entirely by outsourcing distribution to other entities. *Id.* at 13. Unlike a true *cy pres* fund, Envision maintains control over the entire fund. *Id.* Essentially, Envision retains the ability to treat the "scholarship fund" as a promotional tool, akin to a retail sales event, designed to generate more business. *Id.*

3

While the settlement requires Envision to deplete the fund within seven years of creation, it does not prohibit Envision from transferring the funds to a related entity to be distributed well after seven years of the creation of the fund. *Id.*   In exchange, all members of the plaintiff class release all claims, known or unknown, relating to or arising out of the conferences. *Id.* at 14-15.

**ARGUMENT**

**I.     THE PROPOSED SETTLEMENT IS SUBJECT TO AND DOES NOT SURVIVE HEIGHTENED SCRUTINY**

      **A.     The Class Action Fairness Act requires heightened judicial scrutiny of coupon settlements.**

The proposed settlement in this case is a form of what is commonly termed a "coupon settlement."[2]  "While CAFA does not expressly define what a coupon is, the legislative history suggests that a coupon is a discount on another product or service offered by the defendant in a lawsuit." *Fleury v. Richemont N. Am., Inc.* No. C-05-4525 EMC, 2008 WL 3287154, at *2 (N.D. Cal. Aug. 2, 2008) (Attached as Ex. A).

Here, the sole benefit offered under the settlement to the class amounts to a discount on Envision's services.[3]  Unnamed class members who submit a claim certifying that they attended the conferences but missed the inaugural ceremony on the National Mall, the inaugural parade or the Black Tie Gala Inaugural Ball are eligible to receive two coupons.  These coupons (with a face value of $625.00 each) may be applied towards tuition to two separate, future events unless the tuition price exceeds $3,500. Doc. No. 18-2, at 10-11.

---

[2] "Coupon-based settlements take many forms.  Some class action settlements are paid exclusively in coupons, while others combine cash and coupons.  Settlement coupons are sometimes structured as an absolute dollar discount, or as a percentage off the retail price.  In many ways, settlement coupons may resemble traditional promotional coupons." Christopher R. Leslie, *The Need to Study Coupon Settlements in Class Action Litigation*, 18 GEO. J. LEGAL ETHICS 1395, 1396 (2005) ("*The Need to Study*").

[3] The parties even explicitly state, "*The full scope of the relief* to the Settlement Class available to each Class Member shall be a Settlement Payment.  Each Class Member shall receive his or her Settlement Payment two Envision tuition vouchers in the amount of $625 each (total value of the two vouchers is $1,250.00.") (emphasis added).

4

As other federal courts have previously recognized, although the fair, adequate, and reasonable language in CAFA mirrors the language of Federal Rule of Civil Procedure 23(e), it is clear that Congress envisioned subjecting coupon settlements to a higher level of scrutiny than previously applied in pre-CAFA cases considering Federal Rule of Civil Procedure 23(e). *Figueroa v. Sharper Image Corp.*, 517 F.Supp.2d 1292, 1321 (S.D. Fla. 2007) ("[this Court] interprets the statutory directive to imply the application of a greater level of scrutiny to the existing [Rule 23(e)] criteria than existed pre-CAFA.").[4]  This heightened scrutiny is in addition to the traditional review process, under which, as numerous courts have stated, the court reviewing the proposed settlement has a fiduciary obligation to the class members. *See, e.g., Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 280 (7th Cir. 2002); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 231 (3d Cir. 2001); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 22 (2d Cir. 1987).

Congress' intent to subject coupon settlements to heightened scrutiny is shown in both CAFA's legislative history and in the express statutory text.  The Senate Judiciary Committee stated the following in its report on CAFA:

> [W]here [coupon] settlements are used, the fairness of the settlement *should be seriously questioned* by the reviewing court where the attorneys' fees demand is disproportionate to the level of tangible,   non-speculative benefit to the class members.  In adopting [Section 1712(e) requirement of a written determination that the settlement is fair, reasonable and adequate]*, it is the intent of the Committee to incorporate that line of recent federal court precedents*[5] *in which*

---

[4] *See also Synfuel Techs., Inc. v. DHL Express, Inc.*, 463 F.3d 646, 654 (7th Cir. 2006) ("[A]lthough this case is not covered by the Class Action Fairness Act (CAFA) of 2005, we note that in that statute Congress required heightened judicial scrutiny of coupon-based settlements based on its concern that in many cases 'counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value.'" [*quoting* Pub. L. 109-2, § 2(a)(3)(A)]); and *Kearns v. Ford Motor Co.,* No. CV 05-5644, 2005 WL 3967998, at *1 (N.D. Cal. Nov. 21, 2005) (In CAFA, "Congress put significant limits on so-called 'coupon settlements' which produce hardly any tangible benefits for the members of the plaintiff class, but generate huge fees for the class attorneys.") (Attached as Ex. B).

[5] Such pre-CAFA decisions include: *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litig.*, 55 F.3d 768, 806-807 (3d Cir. 1995), cert. den'd, 516 U.S. 824 (1995); *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006); *Clement v. American Honda Fin. Corp.*, 176 F.R.D. 15, 29 (D. Conn. 1997); *Buchet v. ITT Consumer Fin. Corp.*, 845 F.Supp. 684, 692, 694 (D. Minn. 1994).

> *proposed settlements have been wholly or partially rejected because the compensation proposed to be paid to the class counsel was disproportionate to the real benefits to be provided to class members*.

S. Rep. 109-14, at 31 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 3, 32 (emphasis

added).  The Senate Judiciary Committee noted it had become aware

> [of] numerous class action settlements approved by state courts in which most – if not all – of the monetary benefits went to the class counsel, rather than the class members those attorneys were supposed to be representing. These settlements include many so-called 'coupon settlements' in which class members receive nothing more than promotional coupons to purchase more products from the defendants.

*Id.* at 16.

The requirement of heightened scrutiny under the Class Action Fairness Act of 2005,

Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of title 28 of the United States Code)

is found in the express statutory text in several locations.

First, 28 U.S.C. § 1712(e) requires not only a fairness hearing for any coupon

settlement, but also a written finding on fairness; it also authorizes the court to direct an

alternative distribution of a portion of the value of unclaimed coupons:

> In a proposed settlement under which class members would be awarded coupons, the court may approve the proposed settlement only after a hearing to determine whether, and making a written finding that the settlement is fair, reasonable, and adequate for class members. The court, in its discretion, may also require that a proposed settlement agreement provide for the distribution of a portion of the value of unclaimed coupons to 1 or more charitable or governmental organizations, as agreed to by the parties. The distribution and redemption of any proceeds under this subsection shall not be used to calculate attorneys' fees under this section.

Second, section 1712(d) permits the court, in its discretion upon the motion of a party, to

"receive expert testimony from a witness qualified to provide information on the actual value to

the class members of the coupons that are redeemed."

Third, section 1712(a)-(c) regulates the calculation and award of attorney's fees to class counsel in coupon settlements, by providing (1) that the portion of any attorney's fee award attributable to the award of the coupons be based on the value to class members of the coupons that are actually redeemed; and (2) that any portion of such award that is not based on the recovery of coupons be calculated with reference to the amount of time class counsel reasonably expended working on the action, including, if appropriate, the application of a "lodestar" and multiplier. *See also* § 1712(c) ("mixed" awards based in part on coupons to be treated similarly).

Thus, the coupon-settlement section of CAFA, 28 U.S.C. § 1712, is "aimed at situations in which plaintiffs' lawyers negotiate settlements under which class members receive nothing but essentially valueless coupons, while the class counsel receive substantial attorneys' fees." S. Rep. 109-14, at 30 (2005).  Here, despite the professed concerns over Envision's financial condition, class counsel is seeking up to $1,455,000 in attorneys' fees and costs under the proposed settlement, which equate to a 1.67 multiplier on Class Counsel's combined lodestar of $857,492 based on 1,876.40 hours of claimed work. Doc. No. 25-1, at 2.

The Judiciary Committee described the abusive potential of coupon settlements in this way:

> [A]busive class action settlements in which plaintiffs receive promotional coupons or other nominal damages while class counsel receive large fees are all too commonplace.  The risk of such abusive practices is particularly pronounced in the class action context because these suits often involve numerous plaintiffs, each of whom has only a small financial stake in the litigation.  As a result, few (if any) plaintiffs closely monitor the progress of the case or settlement negotiations, and these cases become "clientless litigation," in which the plaintiff attorneys and the defendants have "powerful financial incentives" to settle the "litigation as early and as cheaply as possible, with the least publicity."  These financial incentives create inequitable outcomes.  "For class counsel, the rewards are fees disproportionate to the effort they actually invested in the case. * * * For society, however, there are substantial costs: lost opportunities for deterrence (if class counsel settled too quickly and too cheaply), wasted resources (if defendants settled simply to get rid of the lawsuit

7

at an attractive price, rather than because the case was meritorious), and – over the long run – increasing amounts of frivolous litigation as the attraction of such lawsuits becomes apparent to an ever-increasing number of plaintiff lawyers.

*Id.* at 32 (footnotes omitted).

Accordingly, in considering, as section 1712(e) requires, whether a proposed coupon settlement is fair, reasonable, and adequate for class members – a determination that must include written findings – "the judge should consider, among other things, the real monetary value and likely utilization rate of the coupons provided by the settlement." *Id.* at 31. To address coupon-settlement abuse, this requirement is bolstered by the provisions for alternative distribution of the value of unclaimed coupons, the availability of expert testimony to help determine value, and the prohibition on using unredeemed coupons as any part of the basis for an attorney's fee.

In addition to subjecting the proposed settlement to heightened scrutiny as a result of its defining coupon nature, there are other reasons to subject the proposed settlement to heightened scrutiny. Courts generally are wary of settlement agreements where some class members are treated differently than others. *See*, *e.g.*, *True v. Am. Honda Motor Co.*, No. EDCV 07-0287-VAP (OPx), 2010 WL 707338, at *10 (C.D. Cal. Feb. 26, 2010) (*citing In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 808 (3d Cir. 1995)) (Attached as Exhibit C).

Although Envision allegedly made numerous misrepresentations beyond promising access to the inauguration, the inaugural parade, and the Black Tie Gala Inaugural Ball, only class members who missed those events are afforded any relief. This disparity of treatment is true even among those class members who were chiefly concerned with the inauguration, inaugural parade, and the Black Tie Gala Inaugural Ball. Students who were physically present

at these three events, but found Envision's description of them to be misleading, are without relief.[6]   Other federal courts have rejected similar attempts to differentiate among the class to favor certain class members over others. *See True*, 2010 WL 707338, at *10; s*ee also Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F.Supp. 292, 300-01 (M.D. Pa. 1995).

## B.      The proposed coupon settlement is of low value, with disproportionate attorney and incentive fees

As noted by other federal courts and legal scholars, coupon settlements are generally disfavored because they often do not provide meaningful compensation to class members; they often fail to disgorge ill-gotten gains from the defendant; and they often require the class members to do future business with the defendant in order to receive compensation. *See Figueroa v. Sharper Image Corp.*, 517 F.Supp.2d 1292, 1302 (S.D. Fla. 2007) (*citing* Christopher R. Leslie, "The Need to Study Coupon Settlements in Class Action Litigation," 18 GEO. J. LEGAL ETHICS 1395, 1396-97); s*ee also True*, 2010 WL 707338, at *12.  Regrettably, all three problems occur within the Envision EMI settlement proposal.

First, the coupons do not provide meaningful compensation to class members.  Class members who file claims are required to spend hundreds if not thousands of dollars on tuition, but most likely much more, to obtain the full value of the coupons.  *See* Doc. 18-2, at 11. Moreover, tuition at such events *does not* include money for transportation to the event location, souvenirs, other incidentals, or, in some cases, meals at the event location.[7]   In addition to

---

[6] The plaintiff alleged that Envision made numerous misrepresentations to consumers about the level of access to these three events.  *See* Doc. 13, at 9-13 (ex. "As a *special guest* on the National Mall, you will *bear witness* as the President of the United States is sworn into office. . . . Following the inauguration, you will experience the sights and sounds of a jubilant nation during the Inaugural Parade and Black Tie Gala Inaugural Ball.") (emphasis added). Students who were only able to witness the inauguration or inaugural parade from afar and those who attended the Black Tie Gala Inaugural Ball, but did not find it to be as represented, are not eligible to receive coupons.

[7] *See, e.g., Tuition*, NATIONAL YOUNG SCHOLARS PROGRAM, available at www.nationalyoungscholars.org/how.cfm?user=educator (last visited March 10, 2010); *See also, Frequently Asked Questions*, NATIONAL YOUNG LEADERS PROGRAM, available at www.cylc.org/NYLP/NYLP_faq_parents.cfm (last visited March 10, 2010); *See also, Tuition and Financial Assistance*, NATIONAL YOUNG LEADERS CONFERENCE,

paying for the remaining tuition price, class members or "qualified transferees" would have to pay transportation costs, a significant impediment to redemption even assuming unnamed class members are somehow incentivized to submit a claim for coupons in the first place.

Several eligibility restrictions reduce the value of coupons and arbitrarily exclude large numbers of unnamed class members. Only absent class members who make a claim verifying that the covered student *missed* one of the three narrowly defined inaugural events are eligible for two coupons worth $625 each. Doc. 18-2, at 10-11. Students who attended the three events but did not receive the level of access represented by Envision or who allegedly fell victim to other material misrepresentations set forth in the First Amended Complaint[8] are not eligible to receive coupons. None of the notice materials provide unnamed class members any meaningful guidance as to what constitutes "missing" an event, so unnamed class members will most likely interpret the restriction according to the common definition of "miss," which, given the context, means "fail to be present at or for."[9]

Additionally, class members or other redeemers can only use the coupons if no more than ten percent of attendees in a conference have used coupons. *See* Doc. No. 18-2, at 10-11. The proposed settlement does not describe how this determination will be made or when or how redeemers will be informed that their coupon is invalid for the conference of their choice. *Id.* The proposed settlement also restricts class members from redeeming more than one coupon at a time, unless the conference's tuition cost is $3,500 or more (a sum well in excess of many, if not most, Envision conferences, including approximately $1,000 more than the conferences at

available at www.cylc.org/NYLC/NYLC_tuition.cfm (last visited March 10, 2010) (stating that money for lunches and snacks not provided).
[8] Among other things, Plaintiffs allege that Envision "failed to deliver many of the prominent speakers who were promised to appear including Lance Armstrong," "failed to provide an opportunity to meet with certain historians, political experts, leading decision makers, White House officials or congressional staff as promised," and "failed to provide adequate housing and transportation due to the logistical efforts of accommodating over 15,000 students." Doc. 13, at 13-14.
[9] "Miss," DICTIONARY.COM, available at dictionary.reference.com/browse/miss (last visited April 8, 2010).

issue). *Id.* Most likely, class members would have to spend thousands of dollars in additional tuition as well as significant transportation costs *twice* to use the two coupons under the proposed settlement.

Other restrictions also limit the coupons' value. The coupons can only be redeemed by a family member or other student with a 3.5 grade point average or teacher recommendation. *Id.* Additionally, the coupons expire after seven years and can only be claimed for a period of ninety days. *Id.*

The most troublesome aspect of the coupons stems from their fundamental character. The coupons allow Envision to benefit from strong allegations of improper business practices and forces further purchases from Envision by consumers. Seen in the most favorable light, the coupons allow Envision to make a profit, only less profit than it otherwise would. Viewed less charitably, the coupons allow Envision to partially or completely offset any lost revenue from the face value of the coupons by generating more business. The proposed settlement contains no restriction that prohibits Envision from offsetting all or a portion of the face value of the coupons through tuition increases.

While the plaintiff asserts that Envision's initial $1,000,000 refund pool, which would have provided $65 per student, did not provide enough relief, *See* Doc. 13, at 16-17, a payment of $65 in cash to each class member, while deficient in comparison to the strength of the claims asserted, has demonstrably more value to unnamed class members than coupons that require class members to pay thousands of dollars more to Envision to receive any benefit.

In comparison to the low value coupons for the absent class members, class counsel receives a disproportionate $1,455,000 under the proposed settlement (after application of a multiplier), despite Envision's allegedly precarious financial condition. Additionally, each of

*six class representatives* receives a disproportionate $2,500 cash awards. While these named class representatives essentially receive a full tuition refund or close to it, absent class members are stuck with a relatively small discount on a future Envision conference or program. Needless to say, it is doubtful that most unnamed class members remain interested in attending a future Envision conference or program after their disastrous experience during the inauguration, a once in a lifetime event. Moreover, parents whose children had particularly bad experiences with Envision during the inauguration would not be likely to entrust their children to Envision again, even if the children were willing to try another of the company's programs. This is particularly true for those parents who were upset at Envision because of the lack of sufficient child supervision at the conferences.

## II.     THE PROPOSED COUPON SETTLEMENT IS UNFAIR, UNREASONABLE, AND INADEQUATE UNDER TRADTIONAL FED. R. CIV. P. 23(e) ANALYSIS.

Under Federal Rule of Civil Procedure 23(e), the court may approve a proposed class action settlement only if it finds that the settlement is "fair, adequate, and reasonable and is not the product of collusion between the parties." *Thomas v. Albright*, 139 F.3d 227, 231 (D.C. Cir. 1998) (*citing Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1997)); *see* Fed. R. Civ. P. 23(e). This entails essentially a two-part analysis: first, a substantive determination whether the settlement is fair in fact; and second, a procedural review to determine whether there was collusion between the parties. The most important determination and "[t]he court's primary task is to evaluate the terms of the settlement in relation to the strength of the plaintiffs' case." *Albright*, 139 F.3d at 231.

Although there is no single test for determining whether a proposed class action settlement meets the requirements of Rule 23(e), several core factors guide courts in their determination. *See Equal Rights Ctr. v. Washington Metro. Area Transit Auth.*, 573 F. Supp. 2d

205, 211 (D. D.C. 2008); *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 117 (D.D.C. 2007); *In re*

*Vitamins Antitrust Litig.*, 305 F. Supp. 2d 100, 103-04 (D.D.C. 2004).   Courts in this circuit

have considered factors including: (1) the terms of the settlement in relation to the strength of

the claims;[10] (2) the likelihood and risks of establishing liability and damages;[11] (3) the status of

the litigation at the time of settlement;[12] (4) the reaction of the class;[13] (5) and whether the

settlement is the result of arms-length negotiations between experienced counsel.[14]  The first

four factors focus on whether the settlement is fair in fact, the last goes to its procedural

adequacy.

A.      **The likelihood of establishing liability and liquidating a substantial monetary award for the class to judgment is strong, but relief is disproportionately weak.**

An application of the first two factors set forth above counsels against approval of the

proposed settlement. First, the number and significance of contacts with the District of

Columbia make it likely that the District of Columbia Consumer Protection Procedures Act

(CPPA) would be applied to a nationwide class. In an analogous context, the United States

Supreme Court has stated that state law claims may be applied to claims of a nationwide class if

the state has a "significant contact or significant aggregation of contacts to the claims asserted

by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that

the choice of [the state's] law is not arbitrary or unfair." *Phillips Petroleum v. Shutts*, 472 U.S.

797, 821-822 (1985). Here, Plaintiffs have asserted that Envision maintains its principal place of

business in the District, that a substantial portion of the misrepresentations or omissions were

---

[10] *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d at 104; *Equal Rights Ctr.*, 573 F. Supp. 2d at 211.

[11] *Cohen*, 522 F. Supp. 2d at 117.

[12] *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d at 104; *Equal Rights Ctr.*, 573 F. Supp. 2d at 211; *Cohen*, 522 F. Supp. 2d at 117.

[13] *Id.*

[14] *See id.*

orchestrated and implemented in the District, that the contract was meant to be substantially performed in and was breached in the District, and further that a substantial part of the underlying events and omissions occurred in the District. *See* Doc. 13, at 5-6.

Liability appears likely to be established under the District of Columbia Consumer Protection Procedures Act (CPPA), which allows private plaintiffs to recover "treble damages, or $1,500 per violation, whichever is greater, payable to the consumer;" "reasonable attorney's fees;" "punitive damages;" and, "in representative actions, additional relief as may be necessary to restore . . . money or property" to injured consumers.  D.C. Code § 28-3905(k)(1).

It is a violation of the CPPA to misrepresent material facts which have a tendency to mislead or to fail to state a material fact if such failure tends to mislead. *See* D.C. Code § 28-3904(e), (f). Here, Plaintiffs have alleged that Envision failed to provide the major selling points of the inaugural conference, namely special access to the inauguration ceremony; the inaugural parade; the Black Tie Gala Inaugural Ball; keynote speeches by Lance Armstrong and others; access to historians, congressional leaders, White House officials, and other leaders; as well as food and lodging amenities.

Even if one assumes that the coupons are actually worth their face value, a proposition the Attorneys General emphatically reject, it is hard to understand why class members are entitled to substantially *less* than the full tuition price, given the strength of the class's statutory and common law claims.

Instead, the main argument for coupon relief appears to be Envision's purportedly precarious financial condition. Yet even if one were to disregard the assertions that Envision generates $80,000,000 in revenue per year, Doc. 13, at 7, and received at least $40,000,000 in gross revenue from the inaugural conferences, Doc. 13, at 13, Envision's financial troubles, if

any, counsel against a coupon settlement.  Class counsel recites "Envision's current economic condition" as a reason why recovery is in the best interests of the class.  Doc. No. 18-2, at 6. Indeed, it appears that some of the "informal discovery" engaged in by class counsel was related to Envision's finances. *Id.* at 5.  But if Envision's financial condition is precarious, a coupon redeemable only for future Envision conferences is less valuable than whatever cash is available for class members now.  Moreover, it goes without saying that Envision's financial condition is not an impediment for the parties to agree to a payment of up to $1,455,000 in cash to be paid to class counsel based on a lodestar multiplier of 1.67. Doc. No. 25-1, at 2.

Other federal courts have rejected similar arguments that the defendant's purported precarious financial condition should justify a coupon settlement.  In *Figueroa v. Sharper Image Corp.*, the Southern District of Florida acknowledged the parties' contention about Sharper Image's precarious financial condition, but rejected that as a basis for approval of the coupon settlement and stated, "The undersigned agrees with the Attorneys General's view that because the proposed payout here is of negligible value, the small risk of receiving nothing is worth taking." 517 F.Supp.2d 1292, at 1328 (S.D. Fla. 2007).  A similar result should occur here, especially given that the coupons appears to be even less valuable than the coupons in *Sharper Image* because of the numerous restrictions on eligibility and use and the requirement that redeemers pay Envision thousands of dollars more to use them.

Moreover, regardless of the financial condition of a defendant, a company should not be allowed to benefit based on resolution of strong allegations of commercial misconduct, yet this is what the coupon component and "*cy pres*" component effectively accomplish.

     **B.**     **The proposed settlement was reached prior to class certification.**

The parties reached the proposed settlement prior to a hearing on a motion for certification. Other federal courts have held that heightened scrutiny is the appropriate standard of review for settlements reached prior to certification. *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004) ("[W]here settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously, we require district courts to be even more scrupulous than usual when examining the fairness of the proposed settlement."); s*ee also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

### C. The reaction of the class and opposition of governmental participants counsel against settlement approval.

While the Attorneys General are without knowledge as to the exact number of class members who have or will submit formal objections to the settlement, a number of class members, who formed a Facebook group devoted to the settlement, have expressed strong opposition to the settlement. *See* Ex D.

In interpreting similar tests concerning the number of objections from class members, other federal courts have recognized that the objections of the Attorneys General made in the interest of protecting their residents should weigh against approval of the settlement.

As an example, the Southern District of Florida stated the following:

Few class members have expressed interest in the parties' proposed settlement, and few have objected.  Those who have objected, however, have done so most strenuously and with valuable insights.  Indeed many of the revisions to the initial terms of the proposed settlement result from the salient points brought out by the objectors and their counsel.  What distinguishes this case from other class actions, however, is the singular appearance of the Attorneys General of thirty-five states and the District of Columbia, representing hundreds of thousands, if not millions, of eligible class members.  Appearing as *amicus curiae* on behalf of their citizens, the Attorneys General have objected at every turn to each version of the parties' proposed coupon settlement. . . . The vigor and substance of the objections presented counsels against a finding favorable to the parties on this [Fed. R. Civ. P. 23(e)] factor.

16

*Figueroa v. Sharper Image Corp.*, 517 F.Supp.2d 1292, 1328 (S.D. Fla. 2007).

Attorneys General are increasingly participating in class actions. *See* Catherine M. Sharkley, *CAFA Settlement Notice Provision: Optimal Regulatory Policy?* 156 U. PA. L. REV. 1971, 1988-1990 (2008) (describing both formal and informal actions taken by state attorneys general).  Attorneys General generally participate either by filing a *parens patriae* suit, by intervening in a class action or, as here, by filing an *amicus curiae* brief in a pending class action.[15]  *See* Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors,* 2003 U. CHI. LEGAL F. 403, 453 (*"Class Action Objectors"*).[16]  Brunet notes that government attorneys generally possess the substantive expertise required to evaluate a class action settlement:

> First, counsel for the state agency may provide considerable substantive expertise.  A lack of procedural class action experience should not doom the state agency's ability to evaluate a settlement's adequacy.  Much of our present thinking about the adequacy of a settlement focuses upon substance—whether the settlement approximates a probable trial result.  The proposed settlement will be negotiated in the shadow of the substantive law.  The attorney for an agency will likely be strong on substance, if not as strong on procedure.

*Class Action Objectors*, at 451.

---

[15] For example, in September 2001 the Texas Attorney General objected to a proposed settlement of a Pennsylvania class action against Conseco, Inc., regarding whether nursing home policies misled elderly insureds.  *See Milkman v. Am. Travelers Life Ins. Co.,* No. 03775 (Penn. Ct. Common Pleas 2001); *see also Roller-Edelstein v. Wyndham Int'l, Inc.,* Case No. 02-04946-A (Cir. Ct. - Dallas 2006) (Florida Attorney General objected to proposed class action settlement concerning disclosure of prices at hotel chain).

[16] *See, e.g., Heaton v. Monogram Credit Card Bank of Georgia,* 297 F.3d 416, 426-27 (5th Cir. 2002) (allowing intervention by FDIC into class action alleging credit card fees to be illegal); *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 298 (3d Cir. 1998) (illustrating the intervention by the Massachusetts Insurance Commissioner, the Attorney General, and the Texas Insurance Commission into a class action litigation brought by life insurance policyholders alleging fraudulent sales practices); *Texas v Am. Tobacco Co.,* 14 F. Supp. 2d 956, 962 (E. D. Tex. 1997) (approving a state *parens patriae* action seeking recovery of Medicaid losses against the tobacco industry); Edward Brunet, *Improving Class Action Efficiency by Expanded Use of Parens Patriae Suits and Intervention*, 74 TULANE L. REV. 1919, 1932-34 (2000) (concluding that the state can be an effective monitor of class action settlements).

Here, the objections raised by the Attorneys General go to the heart of the settlement. As argued in Part I, courts should embark upon enhanced scrutiny of coupon settlements such as this one.  Additionally, the absence of objections does not necessarily indicate that the settlement is acceptable.  Filing an objection to the settlement invokes substantial transaction costs involving an investment of time, money, and other resources.

### III. CLASS COUNSEL AND CLASS REPRESENTATIVES INADEQUATELY REPRESENTED THE CLASS BY SECURING ATTORNEYS' FEES AND INCENTIVE AWARDS DISPROPORTIONATE TO RECOVERY OF UNNAMED CLASS MEMBERS.

Federal Rule of Civil Procedure 23(a)(4) requires that the representative parties "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  The rule "also factors in competency and conflicts of class counsel." *Id.* at 626, n.20.  The adequacy of the class representatives and of class counsel is a fundamental requirement of certification under Rule 23, no less necessary in a settlement class. *Id.* at 619-20 (the Rule 23 requirements, excluding Rule 23(b)(3)(D)'s manageability inquiry, "demand undiluted, even heightened, attention in the settlement context").  Indeed, adequacy is an explicit requirement of class settlement approval. Fed. R. Civ. P. 23(e)(2).  Moreover, inadequate representation can create a constitutional infirmity.  *See Hansberry v. Lee*, 311 U.S. 32, 40-45 (1940).

The terms of a class action settlement can directly undermine the adequacy of representation of absent class members.  In *Amchem*, the Third Circuit "homed in on settlement terms in explaining why it found the absentees' interests inadequately represented." *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 625 (1997).  On review, the Supreme Court held that "[t]he Third Circuit's close inspection of the settlement in that regard was altogether proper."

18

*Id.* at 620.  That is, procedural defects may properly be uncovered through an examination of the substance of the settlement.

Attorney fees and incentive awards disproportionate to class recovery can evidence the kind of conflict of interest that demonstrates inadequate representation of absent class members. For example, the Ninth Circuit Court of Appeals recently held that incentive agreements can "put class counsel and the contracting class representatives into a conflict position" where "the effect [is] to make the contracting class representatives' interests actually different from the class's interests in settling a case." *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 959 (9th Cir. 2009).  While that case involved pre-settlement incentive *agreements*, disproportionate incentive awards and attorney fees may lead to the same kind of conflict position, resulting in inadequate representation. *See Clement v. Am. Honda Fin. Corp.*, 176 F.R.D. 15, 22 (D. Conn. 1997) (rejecting class certification and class settlement of a consumer action where class members received $150 or $75 coupons, three class representatives received $2500 incentive fees, and attorneys received $139,000 in fees).  In *Clement*, the United States District Court for the District of Connecticut held that the proposed class was not properly certified, *id.* at 24, given the conflict of interest evident in the terms of the settlement, finding that:

> [T]he representative parties do not fairly and adequately represent the interests of the class.  While the named plaintiffs each secured a $2500 cash payment for themselves and a $140,000 attorney fee award for their attorneys, the individual class members were to receive, as discussed more fully below, a worthless coupon and deficiency credit.

*Id.* at 22.

The disproportionality of attorneys' fees and incentive awards to class relief strongly suggests that the absent class was not adequately represented.  The disparity between class counsel's $1,455,000 cash award and the two $625 coupons available to class members provides compelling evidence of inadequate representation.

19

## CONCLUSION

For the reasons stated above, the proposed settlement should be rejected.

Respectfully submitted,[17]

PETER J. NICKLES
Attorney General for the District of Columbia

GEORGE VALENTINE
Deputy Attorney General, Civil Litigation Division

/s/  Bennett Rushkoff

_____
BENNETT RUSHKOFF, D.C. Bar. No. 386925
Chief, Public Advocacy Section
Office of the Attorney General
441 4th Street, N.W., Suite 600S
Washington, DC 20001
(202) 727-5173
bennett.rushkoff@dc.gov

ROBERT E. COOPER, JR.
Attorney General and Reporter
State of Tennessee

/s/ Brant Harrell*

_____
BRANT HARRELL, TN B.P.R. No. 024470
Assistant Attorney General
Consumer Advocate and Protection Division
425 Fifth Avenue North, 2nd Floor CHB
Nashville, TN 37243
(615) 741-3549 (phone), (615) 532-2910 (fax)
Brant.harrell@ag.tn.gov

Dated:  April 9, 2010                    * *pro hac vice* application forthcoming

---

[17] This brief is also supported by Attorneys General Daniel Sullivan of Alaska, Richard Blumenthal of Connecticut, Bill McCollum of Florida, Lawrence Wasden of Idaho, Lisa Madigan of Illinois, Steve Six of Kansas, Douglas Gansler of Maryland, Martha Coakley of Massachusetts, Mike Cox of Michigan, Jim Hood of Mississippi, Catherine Cortez Masto of Nevada, Paula Dow of New Jersey, Gary King of New Mexico, Wayne Stenehjem of North Dakota, Richard Cordray of Ohio, Tom Corbett of Pennsylvania, Henry McMaster of South Carolina, Marty J. Jackley of South Dakota, William H. Sorrell of Vermont, and Darrell V. McGraw, Jr. of West Virginia.